369 F.2d 143
 Alice Kathryn HENDERSON and David Henderson, Plaintiffs-Appellees,
v.
SELECTIVE INSURANCE COMPANY, Defendant-Appellant,
Firemen's Fund Insurance Company, Defendant-Appellee.
Dorothy MOORE and Josephine Hayes, Plaintiffs-Appellees,
v.
SELECTIVE INSURANCE COMPANY, Defendant-Appellant,
Firemen's Fund Insurance Company, Defendant-Appellee.
Alice Kathryn HENDERSON and David Henderson, Plaintiffs-Appellees,
v.
FIREMEN'S FUND INSURANCE COMPANY, Defendant-Appellee,
Allstate Insurance Company, Intervenor-Appellant.
Dorothy MOORE and Josephine Hayes, Plaintiffs-Appellees,
v.
FIREMEN'S FUND INSURANCE COMPANY, Defendant-Appellee,
Allstate Insurance Company, Intervenor-Appellant.
 No. 16776.
 No. 16777.
 United States Court of Appeals Sixth Circuit.
 November 23, 1966.
 
 1
 Harold D. Ricketts, Bowling Green, Ky., for appellant, Selective Ins. Co., Harlin, Parker & Ricketts, Bowling Green, Ky., on the brief.
 
 
 2
 Jerry L. Moore, Bowling Green, Ky., for appellant, Allstate Ins. Co., Bell, Orr & Reynolds, Bowling Green, Ky., on the brief.
 
 
 3
 E. R. Gregory, Bowling Green, Ky., for appellees, Alice Kathryn Henderson and David Henderson.
 
 
 4
 Marshall Funk, Bowling Green, Ky., for appellees, Dorothy Moore and Josephine Hayes.
 
 
 5
 J. L. Richardson, Jr., Louisville, Ky., for appellee, Firemen's Fund Ins. Co.
 
 
 6
 Before CELEBREZZE and PECK, Circuit Judges, and TAYLOR, District Judge.
 
 
 7
 ROBERT L. TAYLOR, District Judge.
 
 
 8
 In May, 1962, Charles Hunt, Jr., a prospective purchaser of a 1962 Ford Galaxie owned by Louisville Motor Company (herein called Louisville), while driving said car, collided with another automobile operated by Plaintiff-Appellee, Alice Kathryn Henderson. Two companions of Hunt — Dorothy Moore and Josephine Hayes, were injured, as were the occupants of the other car, Alice Kathryn Henderson and David Henderson.
 
 
 9
 Damage suits were filed by the four injured parties in the Circuit Court of Warren County, Kentucky against Hunt, the driver, and against Louisville, the owner of the car. Hunt's case was defended by his insurer, Allstate Insurance Company (herein called Allstate), and Louisville's by its insurer, Selective Insurance Company, (herein called Selective). Hunt had been given permission to drive the 1962 Galaxie by one Donald Martin, a salesman of Louisville.
 
 
 10
 During the course of the trial, a directed verdict was entered as to Louisville on the express ground that there was insufficient evidence to establish an agency relationship between Louisville and Martin. The case was submitted to the jury on the liability of Hunt only and the following verdicts were returned:
 
 
 11
 Dorothy Moore $10,801.45
 Josephine Hayes 25,780.85
 Alice Kathryn
 Henderson 30,861.94
 David C. Henderson 5,000.00
 
 
 12
 Allstate paid into Court $11,300.00, the full extent of its policy coverage, plus the court costs in the amount of $532.75. These sums were proportionately applied as credits on the respective judgments, leaving balances due as follows:
 
 
 13
 To Dorothy Moore $ 9,372.95
 To Josephine Hayes 22,209.35
 To Alice Kathryn
 Henderson 26,861.94
 To David C.
 Henderson 2,700.00
 
 
 14
 This action was brought by the four judgment creditors against Selective and Firemen's Fund Insurance Company which did not appear in the state court action and which is the insurer of the salesman, Donald Martin. Herein, the latter insurance company is called Firemen's. Allstate intervened, asking judgments against Selective and Firemen's for $14,968.01, the amount paid out by it on the judgments, plus its reasonable attorneys fees incurred in defending the state court action. Liability for the injuries was determined against Hunt in the state court. That question is not now before us.
 
 
 15
 Recovery in this action, as District Judge Swinford pointed out at the trial in the district court, depends upon the provisions of the policies and, we might add, upon the facts with reference to whether Hunt, when the accident occurred, was using the car with the permission of the owner. The policies are not before the Court in their entirety. However, Selective in its Appendix has incorporated a memorandum which includes pertinent policy provisions from Selective's policy and from Firemen's. Those provisions from Selective's policy are as follows:
 
 
 16
 "The unqualified word `Insured' includes the named insured and also includes * * * (2) under coverages A and C any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, * * *"
 
 And those from Firemen's are:
 
 17
 "Persons Insured: The following are insured under Part I:
 
 
 18
 * * * * * *
 
 
 19
 "(b) with respect to a non-owned automobile,
 
 
 20
 "(1) the named insured,
 
 
 21
 "(2) any relative, but only with respect to a private passenger automobile or trailer, provided his actual operation or (if he is not operating) the other actual use thereof is with the permission, or reasonably believed to be with the permission, of the owner and is within the scope of such permission, and
 
 
 22
 "(3) Any other person or organization not owning or hiring the automobile, but only with respect to his or its liability because of acts or omissions of an insured under (b) (1) or (2) above."
 
 
 23
 With respect to Hunt's authority to operate the car at the time of the collision, parties took the depositions of Dale Wells, Sales Manager of Louisville, of Roy Phelps, Assistant Sales Manager of Louisville, of Donald Martin, the salesman who turned the car over to Hunt, and of Hunt himself. Counsel for Selective participated in the taking of these depositions and conducted cross-examination of all but Hunt.
 
 
 24
 Dale Wells deposed, in effect, as follows: That he became Sales Manager of Louisville in December, 1960 and occupied that position on May 5, 1962. That it was the general policy of the Company to permit a person who is interested in buying an automobile to drive the car without somebody being with him. That this policy was followed where it was felt that the prospective purchaser was thoroughly interested in the car. He testified that the general salesman had the right to allow a customer to drive a car if he wanted to. On cross-examination, he testified to the circumstances under which Martin took the car to Butler County. He was not on the premises when Martin talked to Phelps but Phelps reported to him that Martin had taken the car and that he, Phelps, had given him permission to do so for the purpose of selling the car to his brother or brother-in-law. On re-direct, he testified that he did not know how good the prospects for a sale were but that he did not call Martin by telephone and rescind or countermand the permission given him by Mr. Phelps to take the car.
 
 
 25
 Roy Phelps, as Assistant Sales Manager, had five salesmen operating under him, of whom Donald Martin was one. With respect to the policy of the company in requiring a salesman to accompany a prospect driving a car, he testified that if a salesman qualified the prospective customer they let the latter drive the car. He testified further that the car given to Martin was a demonstrator and that the latter had been using it three or four days while his own car was being repaired. With respect to the trip to Butler County, he said that Martin had told him he was thinking in terms of trading it and would call him back and that he, Phelps, said: "Go ahead and take it." He testified in effect that Mr. Wells knew that Martin was using the car while his car was being repaired and was using it both to go back and forth to work and to show it and that he made no objection to it. Phelps testified that in 50% or 60% of the cases he closed deals made for cars without consulting Mr. Wells or Mr. Cooper (presumably the Manager of the Company). On cross-examination, Phelps testified that he was "reasonably certain" that Martin had been using the demonstrator for three or four days before taking it to Morgantown with Mr. Wells' knowledge. That Martin could use the car for whatever purpose he wanted but that he did talk about the proposed deal and that he, Phelps, talked to Wells about it. He was aware of the type of car owned by Martin's brother-in-law, namely, a 1961 Chevrolet Impala and that in a general way they had discussed what it would be worth on a trade or how much difference Louisville would have to get to make a trade. Still on cross-examination, he testified that he, Phelps, told Martin it was O.K. to go to Morgantown and show the car to his brother-in-law.
 
 
 26
 Donald Martin testified that he knew of no set policy of Louisville with respect to people trying a car out of the presence of the salesman, but that generally "if you didn't think a guy was liable to skip out of town with the car * * * he could ride by himself, but if you thought he might be the kind of guy that would steal it, ride with him." Questioned as to the circumstances under which he delivered the car to his brother-in-law to drive, he testified: "I just told him to drive it and see if he liked the car and then we'd try to arrive at a figure and get together on a trade." He did not tell him where to go or what time to bring it back when he was trying it out. On cross-examination, he testified that his brother-in-law had his permission to drive the car and that when he took the car to Butler County he felt and believed that he was obeying the orders of Louisville Motors Company and that he had full permission of his superiors at Louisville to take it there.
 
 
 27
 Hunt testified that at the time the car later involved in the accident was turned over to him he had been "jockeying" on another car, a more expensive model. Upon being asked how he managed to get the car into his possession, he testified:
 
 
 28
 "A Well, it was a demonstrator. It had a number of miles, I don't recall the miles, but it was fairly low mileage, and it was something similar to what I had been wanting. And I figured I'd trade for a lot less and I couldn't get a brand-new one, so we just took it to talking and I wanted to drive. I don't know just how it all came about, if he told me I could drive it or if I asked him if I could drive it.
 
 
 29
 "Q For what purpose were you considering driving it?
 
 
 30
 "A Well, I was considering buying this instead of a new one.
 
 
 31
 Just like I was saying, we was talking about trading the thing. I don't know if I told him I would take it and drive it and see if I liked it or if he told me to take it and drive it and see if I liked it, but I'm quite sure there's no one in this room that would go buy a used car without driving it.
 
 
 32
 "Q And you wanted to drive the car to see about buying it, is that right?
 
 
 33
 "A Why sure. I had a decent car, I didn't have to borrow something to drive.
 
 
 34
 "Q Now, I believe in driving this car that day you had this wreck that you had the lawsuit in Warren Circuit Court over?
 
 
 35
 "A That's right." As we have said, Selective participated in the taking of these depositions, but took none of its own.
 
 
 36
 On the basis of this evidence, Judge Swinford ruled that Hunt was a permittee of both Louisville and Martin, and that coverage was not based upon an agency relationship between Martin and Louisville but upon a permittee relationship provided under each of their policies. He held that under the circumstances the temporary operation of the car under the conditions here could reasonably be expected by the owner and were embraced within the authority conferred on Martin by his employer. By the same reasoning, he deemed Hunt a permittee of Martin and covered by his policy also. Judge Swinford rejected the defense by Selective and Firemen's of res adjudicata on the ground that neither was a party defendant in the state court proceeding and further that the issue before him involved an interpretation and application of the policies and not the liability of Hunt to the judgment creditors.
 
 
 37
 The court having decided that plaintiffs were entitled to judgments against all three insurance companies, proceeded to determine the respective liability of each company as to the others.
 
 
 38
 Firemen's contended that since its coverage of the operator of a non-owned automobile was excess insurance over other valid and collectible insurance, Selective, as insuror of the automobile, was the obligor for the primary insurance. The Court held that Firemen's was bound only for excess insurance and since the judgments did not reach the limits of the policy issued by the primary carrier (coverage of Selective being $100,000.00 for any one person in any one accident and up to $300,000.00 for any one accident) there was no pro rata share for Firemen's to pay, notwithstanding its liability to plaintiff-creditors.
 
 
 39
 Although we have grave doubts that the policy provisions of Firemen's cover a mere operator of a non-owned automobile, that question was not raised in the arguments. But assuming that he was covered, we think Firemen's was liable under the policy terms for excess insurance only.
 
 
 40
 In State Farm Mutual Automobile Insurance Company v. Hall, 292 Ky. 22, 165 S.W.2d 838, the Court of Appeals of Kentucky had before it a factual situation very similar to the one before us, except that in Hall only the insurors of the owner and of the driver were involved, and no third person appeared between the owner and driver as did defendant Martin in our case. Otherwise, the facts are quite similar. Chancellor was owner of the car involved in the accident and his insurance with State Automobile Mutual Insurance Company (hereinafter called State) for $20,000.00 not only protected him but any person driving the car with his permission. Hall's policy was with State Farm Mutual Automobile Insurance Company (hereinafter called Mutual) for $5,000.00 and protected him while driving another's car with the owner's permission. Hall's policy provided:
 
 
 41
 "The insurance shall be excess insurance over any other valid and collectible insurance available to the insured, either as an insured under a policy applicable with respect to the automobile or otherwise, against a loss covered hereunder."
 
 
 42
 Hall and Chancellor were on a business trip in Chancellor's car, which Hall was driving. The car struck Patrick Smith, who was killed. His administrator sued both Hall and Chancellor and recovered a judgment for $2,500.00. After the verdict Mutual notified Hall that the State policy covered him and withdrew from the case. An execution issued against Hall and no property was found. State thereupon advanced Hall $2,578.61 in the form of a "loan" to satisfy the judgment. In an archaic procedure, Hall then sued Mutual (his own company) alleging he had satisfied the judgment and that Mutual was liable for the sum he had expended. The Court indicated Hall would be liable to repay the "loan" from State only to the extent of his recovery from the other insurance company, Mutual. The lower court entered a judgment for plaintiff and defendant appealed.
 
 
 43
 The Court of Appeals reversed stating that Mutual was liable only for the excess insurance, and since State's primary coverage was $20,000.00 and the judgment against Hall only $2,500.00 there was no excess coverage to pay.
 
 
 44
 In 7 Am.Jur. 2d — Automobile Insurance — Section 202, is is said:
 
 
 45
 "* * * where one of the policies contains an `excess insurance' clause and the other a `pro rata' clause — and the `excess insurance' clause pertains to nonownership coverage, the conclusion is generally reached — no matter how various the reasoning adopted in support of it in the different cases may be — that the policy issued to the owner of the vehicle is the `primary' policy, and the company issuing it is liable up to the limits of the policy without apportionment. * * *" (Emphasis added.)
 
 
 46
 To the same effect, it is said in 76 A.L.R. 2d, page 505:
 
 
 47
 "* * * if the non-ownership coverage offered by one of the policies involved is of the `excess insurance' type, the conclusion is generally reached — no matter how various the reasoning adopted in support of it in the different cases may be — that the policy issued to the owner of the vehicle is the `primary' policy, and the company issuing it is liable up to the limits of the policy without apportionment, although the policy contains a `prorata' clause. To state the proposition in another way: if one policy has been issued to the owner of the vehicle causing damage, and another covers the same loss by virtue of the relationship to the accident of one who is not the vehicle owner, the latter's insurer, at least where its coverage is of the `excess insurance' variety, is in the favorable position and need not assume any of the loss, although the vehicle owner's policy contains a `prorata' clause. * * *" (Emphasis added.)
 
 
 48
 See also, Citizens Mutual Automobile Insurance Company v. Liberty Mutual Insurance Company, 273 F.2d 189 (C.A. 6) where the owner's coverage was less than the judgment and much less than that of the lessor.
 
 
 49
 To repeat, on the assumption that Firemen's policy covered a driver operating with Martin's permission the primary liability is Selective's since it insured the owner and since its policy coverage was well in excess of the total amount of the judgments. Firemen's is not obligated, under its excess insurance clause, to pay a pro rata share of the judgments.
 
 
 50
 The same reasoning applies, up to a point, to Allstate. Since Selective's liability was primary, the Court properly held that Allstate might recover from Selective the full extent of the judgment against it, namely $11,300.00. In addition, we think the District Court properly allowed Allstate its costs of $532.75, because Allstate had borne the costs of the trial on the question of liability, for which, with respect to the original plaintiffs, Allstate, Selective and possibly Firemen's were liable.
 
 
 51
 But the District Court ruled that Selective was not liable to Allstate for the latter's attorneys fees. Allstate questions this ruling. We cannot say that the Court was wrong. We have been cited to no statute in the State of Kentucky which makes the allowance mandatory and to no case either in Kentucky or elsewhere allowing attorneys fees in this type of case. Commercial Standard Insurance Company v. American Employers Insurance Company, 209 F.2d 60 (C.A. 6) which is heavily relied upon by Allstate is not clearly in point. Counsel admits in its brief that that case involved "pro rata" coverage and that the case before us involves "primary" and "excess" coverage.
 
 
 52
 As between plaintiffs and defendant Hunt, the latter was liable. Allstate was obligated to defend him regardless of what Louisville did, and its liability was not a concurrent one with Selective.
 
 
 53
 In Commercial Standard, our Court laid stress on the existence of "concurrent" liability. Responsibility was easy to apportion. All that was done was to pro rate the judgment.
 
 
 54
 In our case, Hunt's liability to plaintiffs was its own. He was made a party, he had to defend. Defense was based on his own relationship to the accident, which was quite different from that of Louisville.
 
 
 55
 In 20 Am.Jur.2d — Costs — Section 74, it is said:
 
 
 56
 "An award of attorneys' fees in the federal courts may, of course, be made by virtue of a contractual right thereto. Also, specific provision is made in the federal statutes for award of attorneys' fees in various types of cases. Some of these statutes are mandatory in terms, providing that attorneys' fees `shall' be awarded to the party bringing suit, if he is successful; others are discretionary in terms, providing that the court `may' grant counsel fees to the prevailing party, whether the prevailing party is the plaintiff or the defendant. But except where a valid contractual provision, federal statute, or a contrary requirement of applicable state law dictates a contrary result, the general rule may be stated that the prevailing party in an action in federal court is not entitled to recover counsel fees." (Emphasis added.)
 
 
 57
 This quotation is not precisely in point, but it indicates the special situations in which fees are allowed. We think the Court's ruling was justified. Carr v. American Universal Insurance Company, 341 F.2d 220 (C.A. 6).
 
 
 58
 After the appeal was filed, Selective filed a motion in this Court for an order dismissing both cases and remanding them to the Warren County Circuit Court on the ground that 28 U.S.C. Sections 1332(c) and 1441 were amended August 14, 1964 by the addition of the following clause:
 
 
 59
 "(c) For the purposes of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business: Provided further, That in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of the State of which the insured is a citizen, as well as of any State by which the insurer has been incorporated and of the State where it has its principal place of business."
 
 
 60
 Selective argues that the causes of action were removed following the effective date of the amendment and that there is no jurisdiction of the causes of action because of lack of diversity of citizenship. We think the motion should be denied. Senate Report No. 1308, U.S. Code Congressional and Administrative News, 88 Cong. 2nd Sess. 1964, Vol. 2, pages 2778-2779, filed in connection with the amendment, shows that the proviso was enacted to take care of a situation arising in the States of Wisconsin and Louisiana, as a result of the enactment of "direct action" statutes in those states permitting suits directly against the insurance companies without joining the insured. These state statutes often created a diversity, increasing the case burden on the federal courts, which would not arise had the case been brought directly against the insured. The proviso was not designed to reach the situation with which we are confronted here. White v. United States F. & G. Co., 356 F.2d 746 (C.A. 1).
 
 
 61
 Furthermore, in 78 U.S. Statutes at Large 445, Public Law 88-439, it appears that the amendment was approved August 14, 1964 but that by Section 2 the amendment applied only to causes of action arising after that date. Although this Section 2 was omitted from the U.S. Code, it is the law and applies here. These causes of action arose on May 29, 1964 before the proviso became effective. For this reason also, Selective's motion fails.
 
 
 62
 The motion of Selective is denied.
 
 
 63
 Selective's contention that the District Court erred in its determination of agency of Donald Martin and of permissive use by Charles Hunt, Jr., without giving it an opportunity to take proof on the issue of whether at the time and place of the accident Charles Hunt, Jr. had actual or implied permission or consent from Louisville Motors Company to use the automobile that was involved in the accident is without merit. The permissive use issue was explored fully in the taking of the depositions of various witnesses in which the attorneys for Selective participated. The District Court advised the parties at the time the hearing was set that all questions would be heard and decided. Moreover, Selective had a period of some five months in which to take and present proof on that question.
 
 
 64
 The judgment of the District Court is affirmed.